UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMES E. PARCHER,

      Plaintiff,

v.                                             CASE No.  8:09-CV-857-T-23TGW

SHERIFF DAVID GEE, *et al.*,

      Defendants.

_____

## REPORT AND RECOMMENDATION

    This cause came on to be heard upon the Defendants' Motion for Sanctions Due to Plaintiff's Fraud on the Court (Doc. 61).  The defendants seek dismissal of this lawsuit as a sanction for the plaintiff filing an allegedly fabricated Incident Report to support his claim of civil rights violations.  The plaintiff denies the fraud allegation, and asserts a "counterclaim for sanctions due to the defendants fraud on the court" (Doc. 77).

    Upon consideration of the testimony adduced at two evidentiary hearings, the exhibits, and the parties' memoranda, it is clear that the Incident Report is fabricated, and that the plaintiff willfully and knowingly filed the

fraudulent document with the court to bolster his claims against the defendants. The plaintiff, furthermore, perpetuated the fraud in his testimony at the evidentiary hearing. Under these circumstances, no lesser sanction than dismissal will be effective. I therefore recommend that the Defendants' Motion for Sanctions Due to Plaintiff's Fraud on the Court (Doc. 61) be granted, the plaintiff's counterclaim for sanctions be denied (Doc. 77), and the plaintiff's lawsuit be dismissed with prejudice.

I.

A.    Between May 2006 and January 2012, the plaintiff was incarcerated in local jail facilities as a pre-trial detainee (see Doc. 62, pp. 11-12). In May 2009, the plaintiff filed this lawsuit against the defendants, alleging that they violated his civil rights while he was detained in the Hillsborough County Jail (see Doc. 1, p. 7). The plaintiff accuses the defendants of, among other things, illegally "stopping mail (legal & personal)", "seizing legal documents", and "restricting defendant from writing utensil's" (i.e., pen and paper) while he was incarcerated (see Doc. 50, p. 8, ¶1). The plaintiff alleges that, consequently, he was unable to file

motions and present evidence in several criminal and civil cases, including

in his defense against charges of robbery, aggravated burglary, and battery of

Julie A. Roberts, for which he was found guilty and is serving a life sentence

(Case Number CRC 06-11209CFANO) ("Pinellas County case") (Doc. 50, p.

10).[1]

As pertinent here, the plaintiff's third amended complaint refers

repeatedly to the defendants' alleged seizure of witness affidavits from his jail

cell that could have exonerated him of the Pinellas County charges (see Doc.

50, pp. 8-36).[2] Specifically, the plaintiff alleges (id., p. 13):

> On 2-19-08, Detective Bunton kept legal affidavit's
> that was defense evidence for court.  On 2/19/08
> Deputy Reiter searched and seized 4 witness
> affidavit's notarized from [the plaintiff's] Defense
> Witnesses, and read them, kept them, made copy's,
> and forward them to Det. Bunton to read and
> keep....Det. Bunton per H.C.S.O. Incident Reports
> and log's and shift commander received all
> document's and kept them and only returned
> personal property back, but no legal affidavit's and
> the jail...lost [the plaintiff's] original witness

---

[1] Roberts, a realtor, testified that she was showing a residence to Parcher when he committed armed robbery against her (see Doc. 61-10; Doc. 89-4, pp. 22-24). The jury returned a verdict of guilty on all counts (Doc. 89-4, pp. 16-17).

[2] Page numbers refer to the numbers assigned by CM/ECF at the top of the page.

affidavit's evidence that was sent to [plaintiff] by
mail to use in his case's that witness/victim
recanted....[The plaintiff] does not have name of
other two witnesse's or original notarized affidavit
from victim. The Jail has Report's that these were
forward to Bunton who read and copied. Then
forwarded to other department according to shift
commander Report and was misplaced.

The plaintiff elaborated that "[o]ne affidavit was from victim

[Julie Roberts] saying [she] lied made story up and it was notarized and

signed, other three affidavits said victim confessed they lied and we will

testify to this...."(Doc. 50, p. 24).[3]  The plaintiff asserts that the defendants'

actions violated his rights of access to courts, due process, attorney-client

privilege, equal protection and self-representation, and constituted "tampering

with physical evidence" and "official misconduct" (id., p. 13).

The defendants filed a Motion to Dismiss the Plaintiff's Third

Amended Complaint (Doc. 52), arguing that it "contains only vague and

conclusory allegations and should be dismissed" (id., p. 6). The plaintiff filed

---

[3]Julie Roberts unequivocally denies that she recanted her accusations against the
plaintiff, and stated in a sworn affidavit executed on November 14, 2011, that she "never
prepared, authored, signed, approved or executed any affidavit or any other documents
recanting or otherwise withdrawing my testimony about the events of March 3, 2006, and
the actions of James Parcher" (Doc. 61-10).

an opposition memorandum, repeating that the defendants violated his right to due process by confiscating witness affidavits that could have exonerated him of the charges in the Pinellas County case (Doc. 59, pp. 1, 8). In support of this contention, the plaintiff submitted a document he labeled "Ex. J" (id., p. 26 ("the plaintiff's Incident Report")). The plaintiff alleges this "is a H.C.S.O. [Hillsborough County Sheriff's Office] Report done by a supervisor stating on 2/19/2008 Dep. Stephanie REITER...Confiscated Plaintiff's Witness Affadavit for Pinellas County" (id., pp. 4-5).

Thereafter, the defendants filed this Motion for Sanctions, alleging that the plaintiff's Incident Report was fabricated, and that the plaintiff's lawsuit should be dismissed for committing fraud on the court (Doc. 61, p. 5). The plaintiff filed a "Response to Motion for Sanctions Due to Plaintiffs Alleged Fraud on the Courts" and a "Counterclaim for Sanctions Due to Defendants Fraud on the Court" (Doc. 77). The plaintiff argues that "he committed 'no fraud' on this court, [and] has been 'truthful'" (id., p. 12). He added that it was not possible for him to fabricate the Incident Report because "from 2007-2012 Hillsborough County Sheriffs and Defendants ...

kept Plaintiff in solitary confinement," and he had no computer or typewriter (id., pp. 1, 8).

Furthermore, the plaintiff argued that the defendants should be sanctioned for denying knowledge of the Incident Report and the events described therein (id.). In this connection, the plaintiff contends that defense counsel Christopher Brown gave him the Incident Report during a Pinellas County hearing on August 19, 2011, as part of his inmate file (id., p. 13). The defendants deny that the plaintiff's Incident Report was in the plaintiff's inmate file, or otherwise produced by them (Doc. 78, pp. 2-3).

B.     The cross motions for sanctions were referred to me for a report and recommendation (Doc. 85). Subsequently, an evidentiary hearing was conducted on the motions (Docs. 88, 90). Several defendants appeared with their counsel, HCSO attorney Christopher Brown. The plaintiff appeared telephonically, at his request, and he represented himself pro se.

On behalf of the defense, testimony was given by John Heide, a supervisor and custodian of records for the Hillsborough County Sheriff's Office (HCSO); HCSO Sergeant Howard Lindsey; HCSO Lieutenant Waltraud Addison (retired); HCSO Corporal Cynthia Nietfeldt; HCSO

detective Thomas Dirks; HCSO Lieutenant Christopher Allen (retired); HCSO case manager Harry McCarthy (retired); and HCSO Deputy Stephen Reiter (see Doc. 90). The witnesses were sequestered, and the pro se plaintiff cross-examined each of them (see id.).

The defendants also presented Exhibits A through H, which were admitted at the hearing (id.). The plaintiff did not present any exhibits for admission at the hearing, but attached several exhibits to his memorandum in opposition to the defendants' motion for sanctions (see Doc. 77-1-10).

The focus of the evidentiary hearing was the authenticity of the document that purports to be Hillsborough County Sheriff's Office Detention Services Incident Report number 2008F2202B ("the plaintiff's Incident Report") (Hrg. Ex. E).[4] Lieutenant Addison is identified as its author, and it indicates that the following occurred at "2222/20080219" (i.e., February 19, 2008 at 10:22 p.m.):

> INMATE PARCHER WAS HOUSED IN 3-BRAVO ON FEBRUARY 19, 2008.   SGT. LEGGETT CONTACTED ME AND STATED THAT PARCHER WAS COMPLAINING OF

---

[4]The Incident Report was attached as Exhibit J to the plaintiff's response to the defendants' motion to dismiss (Doc. 89-1, p. 26), and was admitted at the evidentiary hearing as Exhibit E.

LEGAL DOCUMENTS OF WITNESS AFFIDAVITS FOR PINELLAS COUNTY THAT WAS TAKEN BY DEP. REITER. I CONTACTED DET. DIRK WHO STATED DEP. REITER FORWARDED THE CONFISCATED ITEMS TO HIM AND THAT IT WAS SENT TO THE INTERNAL OFFICE FOR INVESTIGATION. LT. ALLEN HAS A REPORT AND LOG AS TO PINELLAS WITNESS AFFIDAVITS TAKEN. PER CASE MANAGER MCCARTHY #1070, PARCHER WILL BE RELOCATED TO 3-DELTA. THIS WILL BE REVIEWED WEEKLY BY THE CONFINEMENT REVIEW COMMITTEE.

Below the narrative are the typewritten names of four officers and their titles, with lines for their signatures, as follows:

----------------- 00569 W ADDISON
ORGINATOR

----------------- 03948 C NIETFELDT
CORPORAL

-------------- 02493 A LEGGETT
SERGEANT

--------------- 00569 W ADDISON
SHIFT/AREA COMMANDER

(Hrg. Exh. E). At the hearing, Sergeant Howard Lindsey testified that his duties include responding to subpoenas for jail detention records, and that he compiled the plaintiff's inmate file. He averred that he searched the HCSO's

-8-

database, and that neither the plaintiff's Incident Report, nor any incident report with that number, exists in the HCSO's records.

Additionally, each of the HCSO officers and employees testified that they had no recollection of the incidents described in the Incident Report. Each witness stated further that the first time they became aware of the plaintiff's Incident Report was in 2011 or 2012, when the authenticity of the document was being investigated.

In particular, Lieutenant Addison, who is identified as the originator of the Incident Report, i.e., its author, testified that she had no recollection of writing the Incident Report, and she emphasized that she was not even on duty when the purported incident occurred at 10:22 p.m., as she (and other witnesses) testified that she did not work the night shift in February 2008.

Additionally, HCSO witnesses testified that it was his or her belief that the plaintiff's Incident Report was fabricated because it contained many anomalies, such as abbreviations that the HCSO does not use, misspellings, and procedural irregularities, including the Incident Report number itself. Thus, witnesses testified that:

- The letter "B" at the end of plaintiff's Incident Report number 2008F2202**B**, signifies that it is a supplemental report.  However, it is not titled a supplemental report, and it clearly is not a supplement to the Original Incident Report, no. 2008F2202**A**, which is in the HCSO database and concerns another inmate who failed to perform kitchen duties (Hrg. Ex. F);[5]

- Original Incident Report 2008F2202**A** occurred on "20080529" (i.e., May 29, 2008), more than three months <u>after</u> the plaintiff's purported Incident Report.  Sergeant Lindsey added, obviously, it is "not possible" to have a supplemental report three months before the Original Report;

- Plaintiff's Incident Report number 2008F2202**B** does not correspond with the HCSO's sequential assignment of numbers based on calendar year.  Sergeant Lindsey elaborated that an incident report generated at the end of February 2008, would have received a number in the 800s, not "2202," which corresponds with incident reports generated months later, in May 2008 (and, incidentally, is the month the Original Incident Report was generated); and

- The plaintiff's Incident Report lists an entry date six days after the occurrence of the incident, and Sergeant Lindsey testified that those dates should be the same.

Additionally, HCSO officers and employees testified to irregularities in the

text of the plaintiff's purported Incident Report, such as:

- It refers to items being sent to the "Internal Office for Investigation," which is not a department in, and or a term used by, the HCSO;

---

[5]An Incident Report that ends with the letter "A" indicates it is an Original Incident Report.

- Detective Dirks' name is misspelled. The Incident Report refers to "Det. Dirk," which omits the "s" at the end of his name. Detective Dirks testified that, if such an error was made, it would have been corrected before the Incident Report was generated;

- Abbreviations of the officers' rank and title, i.e., Sgt., Dep., is contrary to the HCSO procedure of writing out titles in full; and

- The signatory block does not follow the chain of command, as it reflects a lieutenant submitting the report for approval to a lower ranking officer. As several witnesses testified, an HCSO lieutenant would not submit a report for approval to a lower ranking officer of sergeant or corporal.[6]

Moreover, Lieutenant Addison testified that a second document, titled "Inmate Request," was also falsely attributed to her (Hearing Ex. G). The plaintiff grieves in this Inmate Request that Deputy Reiter took his Pinellas County witness affidavits. The bottom portion of that form purports to be a handwritten response from Lieutenant Addison, stating (id.):

> I called Det. Dick's, Deputy Reiter gave your Legal Affidavits to Lt. Which was sent to are Internal Dept. For Investigation, Per your restriction's. Your Affidavit's are there. No Grievance.

The employee signature on the form, written partly in cursive, states "LT. W. Addison, 0569" (Hrg. Ex. G).

---

[6]The plaintiff's Incident Report also misspells "Originator" as "Orginator" (see Hrg. Ex. E).

Lieutenant Addison averred that she has no recollection of writing this response, or the events referred to therein.  Lieutenant Addison testified that she believes the document was fabricated because she did not recognize the handwriting as her own; she would never print her signature; and she signs her personal identification number as "569"; not "0569" as it appears in the Inmate Request.[7]

After approximately two and one-half hours of testimony, the plaintiff informed the court that he reached his jail time-limit on the telephone (see Doc. 90).   Consequently, the hearing was continued to permit the plaintiff to testify on his own behalf (id.).

At the continued hearing, the plaintiff initially sought to forestall further testimony and consideration of the sanctions motion, arguing that his defense has been hampered because the HCSO was purportedly withholding three grievances he submitted in February 2008 regarding the alleged confiscation of his Pinellas County affidavits (see Doc. 94; see also Doc. 98).

---

[7]Similar to the plaintiff's Incident Report, the Inmate Request also misspells Det. Dirks's name, refers to a non-existent "Internal Dept. for Investigation," and abbreviates improperly the officers' titles (Hrg. Ex. G).

Defense counsel responded that the HCSO database had been reviewed, and that it has no other documents related to the plaintiff.[8]

I explained to the plaintiff that the submission of grievances, even if true, does not show that the Incident Report was authentic. Therefore, I overruled the plaintiff's request to continue the hearing. However, in an attempt to afford the plaintiff every reasonable opportunity to support his case, I ordered the HCSO to again search its database for grievances submitted by the plaintiff on, and within one week before, and after, February 20, 2008.

The plaintiff was sworn and he testified, in a narrative manner, that Deputy Reiter seized his affidavits and told him that, per jail procedure, they needed to be looked at by the jail detective. The plaintiff stated that Detective Bunton returned some of the property, but that he did not return the Pinellas County witness affidavits.

---

[8] The plaintiff focuses on a prison Log, entry date 2-20-08, which states that the plaintiff requested a grievance, and that he was given Request #036249 (Hearing Ex. H). Sergeant Lindsey testified that he researched this issue, and averred that grievance #036249 is not in the plaintiff's inmate file, or in the record "anywhere." Sergeant Lindsey opined that it is not within the HCSO records because the plaintiff never returned the grievance form to the HCSO. Sergeant Lindsey added that, if the plaintiff had returned the grievance to the HCSO, the plaintiff would have received a copy of the grievance.

The plaintiff stated that one of confiscated documents was a handwritten affidavit from Julie Roberts, which recants her claims against him. He stated that two other witness affidavits were also taken. The plaintiff testified that he spoke to two sergeants about the confiscated affidavits, and that he filed grievances about the alleged taking.

Upon questioning by defense counsel, the plaintiff testified that he did not fabricate the Incident Report, although he was unable to identify anyone else that would have a motive to fabricate it. The plaintiff also insisted that he received the Incident Report from defense counsel, Christopher Brown, in 2011, during a hearing in the Pinellas County case. The plaintiff testified that the Incident Report was included in a stack of discovery documents produced to him in response to his subpoena for documents.

The plaintiff affirmed that he did not have the means to falsify the Incident Report because he had been in solitary confinement in Hillsborough County Jail. However, defense counsel referred to evidence indicating that the plaintiff had been incarcerated in the Pinellas County Jail, during which he spent 160 hours in its law library (see Doc. 89-4, p. 34). The

-14-

plaintiff did not deny using the Pinellas County law library, but alleged that he did not have access to copiers or fax machines there.

The plaintiff averred further that he received a second affidavit from Roberts, in 2011, that was typewritten and also recanted her claims against him. The plaintiff submitted that purported Roberts affidavit in this case (Doc. 77-5, p. 1; Ex. E). He added, however, that the purported handwritten Roberts affidavit was more valuable because it had Roberts's DNA and fingerprints.

Following the hearing, the HCSO filed a sworn affidavit from Sergeant Lindsey that he "searched the HCSO Detention database for any Grievance/Inmate Requests submitted by James Parcher for the time period February 12, 2008, through and including February 28, 2009, but no responsive documents were found within HCSO's files" (Doc. 99-1, ¶3; see also Doc. 99, pp. 1-2).

The parties were given an additional two weeks to submit any written closing arguments they wished to make in connection with the sanctions motions (Doc. 97). The defendants filed a closing argument (Doc. 100), but the plaintiff did not.

-15-

III.

A.     There is clear and convincing evidence that the Incident Report was fabricated by the plaintiff, and that he knowingly filed the false document with the court to improperly influence the outcome of this lawsuit.

Initially, the notion that Julie Roberts recanted her accusations against the plaintiff, which is the allegation underlying the Incident Report, strains credulity. Thus, Roberts avers that she "never prepared, authored, signed, approved or executed any affidavit or any other documents recanting or otherwise withdrawing my testimony about the events of March 3, 2006, and the actions of James Parcher" (Doc. 61-10, ¶5). She gave similar testimony at the trial (see Doc. 89-4, p. 31). Importantly, Roberts had no motive to lie.

Furthermore, the HCSO witnesses testified that they have no recollection of the occurrence stated in the Incident Report. They testified that they believe the Incident Report was fabricated because it contained irregularities that would not have been present if Lieutenant Addison (or any other HCSO officer, for that matter) had written it.

Those anomalies are compelling evidence that the Incident Report is fraudulent. First, Sergeant Lindsey testified that the plaintiff's Incident Report number does not correspond with the HCSO's numbering protocol. Specifically, several witnesses testified that the letter "B" at the end of the plaintiff's Incident Report number signifies that it is a supplement to an original report. However, Sergeant Lindsey explained that the plaintiff's Incident Report could not have been a supplement to the Original Incident Report, which involved a different inmate in an unrelated dispute about kitchen duties. Additionally, the Original Incident Report was dated three months after the plaintiff's Incident Report, which is not possible.

Moreover, Sergeant Lindsey testified that, based on their chronological numbering of incident reports, an authentic incident report at the end of February 2008 would have received a number in the 800's. The plaintiff's Incident Report number is "2202," which is consistent with reports filed in May 2008, when the original report was filed. In sum, the only reasonable inference from this undisputed evidence is that an individual took the Original Incident Report, number 2008F2202A, and doctored it to appear to be an Incident Report generated in February 2008.

Further, there was undisputed evidence of several anomalies in the text of the plaintiff's Incident Report, which also show that it was not an authentic document. Thus, HCSO officers testified that the plaintiff's Incident Report abbreviates improperly officer titles; refers to a non-existent "Internal Office for Investigation"; misspells the name of Detective Dirks; contains a signatory block that does not follow the chain of command; and identifies Lieutenant Addison as its author even though she was not even on duty when the purported incident occurred.

I find that the HCSO officers were credible, as they independently gave consistent testimony, their testimony was supported by objective facts, there was nothing in their demeanor that indicated any were being untruthful, and none had any apparent reason to prevaricate. The plaintiff, moreover, did not undermine the testimony of the witnesses as to the irregularities in the plaintiff's Incident Report. I therefore find that there is clear and convincing evidence that the Incident Report was fabricated.

Furthermore, it inexorably follows that the plaintiff fabricated the Incident Report. Although the plaintiff testified that he did not fabricate the Incident Report or have the means to do so, his testimony is not credible.

Initially, it is noted that the plaintiff's credibility is questionable because he is a repeated felon who had a lawsuit in this court dismissed for untruthfulness (8:08-CV-2139-T-17TGW).   Notably, Circuit Court Judge Chris Helinger found in the Pinellas County case that the plaintiff had forged or altered documents (see Doc. 89-4, p. 19).

Furthermore, the plaintiff gave false testimony at the evidentiary hearing on matters central to the authenticity of the Incident Report.  Thus, the plaintiff testified untruthfully that he lacked the means to fabricate the Incident Report because he was in solitary confinement in Hillsborough County Jail without a computer, typewriter, paper, or writing instruments (see also Doc. 77, p. 8).   That was patently false because, as defense counsel pointed out, the plaintiff had been incarcerated for a significant time in the Pinellas County Jail, during which he spent 160 hours in its law library and had access to computers, printers, and copy machines for the inmates' use (see Doc. 89-4, pp. 28-29, 34).[9]  This false testimony shows a general lack of credibility, and that the plaintiff was attempting to cover up the fraud.

---

[9]The defendant also pointed out that the plaintiff's incarceration did not preclude the plaintiff from filing several pro se lawsuits and appeals, and submitting numerous documents in criminal cases (see Doc. 61, p. 4).

The plaintiff also testified untruthfully when he averred that he received the Incident Report from defense counsel in a stack of discovery documents. That could not have happened because Sergeant Lindsey, who compiled the plaintiff's inmate file, gave credible and unrefuted testimony that neither the plaintiff's Incident Report, nor the number of the plaintiff's Incident Report, exists in the HCSO records. A fortiori, the Incident Report could not have been given to the plaintiff by defense counsel.

Significantly, the plaintiff was the only person who could benefit from the Incident Report. Further, he attempted to capitalize on it by filing it in this case. In sum, clear and convincing evidence shows that the plaintiff fabricated the Incident Report.

Moreover, the plaintiff's deceit extends beyond the Incident Report. Thus, the plaintiff filed in this case another fraudulent document, which purports to be a typewritten affidavit by Roberts recanting her accusations against the plaintiff (Doc. 77-5, Ex. E). The plaintiff testified that he received this affidavit from Roberts in 2011.[10]   It states, among other

---

[10] That makes this document the third affidavit in which Roberts purportedly recants the plaintiff's accusations against him, as the plaintiff submitted a similar affidavit in the Pinellas County case (Doc. 89-4, p. 31).

things (id.):

> I JULIE A. ROBERTS State that Mr. PARCHER
> did no illegal act's to me and I never saw him
> before....Mr. PARCHER never had any weapon, I
> never had a broken arm, I gave permission to a
> person to withdraw my money...I wish not to show
> up on this matter as I learned statue of limitations
> is 3 years, so I can not be made to show.  I'm sorry
> for any inconvenience and just wanted to set the
> record clear as my health has made me think about
> my past act's....

The text of the affidavit is, in itself, inherently incredible because it does not

make sense.  Further, Roberts averred that she never recanted her allegations

against the plaintiff, and Roberts had no motive to lie.  Moreover, it is

apparent on the face of the document that the plaintiff altered it.  Thus, the

affidavit purports to be signed by a notary, but the plaintiff scratched out the

dates written by the notary, which indicates that the notary block had been

copied and pasted from another document.

Additionally, there was an "Inmate Request" form, in which the

plaintiff alleged, similar to the Incident Report, that Deputy Reiter took from

him Pinellas County witness affidavits (Hrg. Ex. G).  The bottom portion of

that Inmate Request purported to be a handwritten response by Lieutenant

Addison.  That document is also fraudulent.  Thus, Lieutenant Addison

testified, credibly, that she did not write the response, and repeated that she had no recollection of those events. She elaborated that it is not her handwriting nor her signature; she does not place a zero in front of her personal identification number as appears in this document; and that she would never have mentioned a department of internal investigation, because there is none. The plaintiff did not refute the anomalies identified by Lieutenant Addison which show the Inmate Request form was fabricated. Further, there was no one other than the plaintiff who had a motive to fabricate it. [11]

In sum, the evidence presented in this matter shows beyond any reasonable doubt that the Incident Report was fabricated by the plaintiff, and that the plaintiff filed the Incident Report to improperly influence the outcome of this case. Moreover, as shown by the other fraudulent documents mentioned above, the Incident Report was just one aspect of the plaintiff's scheme to defraud the court and the defendants.

---

[11] The defendants, not the plaintiff, submitted the "Inmate Request" form in this case. Therefore, it is not relied upon as a basis for sanctions against the plaintiff, but it is probative of the plaintiff's credibility, and shows the plaintiff's broader fraudulent scheme.

B.     The defendants, as indicated, seek dismissal of the plaintiff's lawsuit as a sanction for committing fraud on the court (Docs. 61, 100). Courts possess the inherent power to impose reasonable and appropriate sanctions in order to protect the orderly administration of justice and to preserve the dignity of the tribunal. <u>Chambers</u> v. <u>NASCO</u>, 501 U.S. 32, 43; <u>Martin</u> v. <u>Automobili Lamborghini Exclusive, Inc.</u>, 307 F.3d 1332, 1335 (11th Cir. 2002). The inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct. <u>Chambers</u> v. <u>NASCO</u>, <u>supra</u>, 501 U.S. at 49. However, because of their potent nature, "inherent powers must be exercised with restraint and discretion." <u>Id</u>. at 44.

Although dismissal of a case with prejudice is a severe sanction, the Supreme Court recognizes that there are circumstances when it is reasonable and appropriate. <u>Id</u>. at 45. Fraudulent conduct may fall into this category. As articulated by an appellate court:

> A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by...unfairly hampering the presentation of the opposing party's claim or defense.

Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir.1989). Thus, punishing fraudulent conduct "is necessary to the integrity of the courts, for tampering with the administration of justice in this manner involves far more than an injury to a single litigant. It is a wrong against the institution set up to protect and safeguard the public." Chambers v. NASCO, supra, 501 U.S. at 44.

Specifically, courts have found dismissal an appropriate sanction when a party commits fraud by fabricating evidence. See, e.g., Aoude v. Mobil Oil Corp., supra, 892 F.2d at 1115 (1st Cir. 1989) (action dismissed where party fabricated purchase agreement which formed the basis of the contract claim at issue); Vargas v. Peltz, 901 F.Supp. 1572, 1581-82 (S.D. Fla.1995) (case dismissed for fraud upon the court when plaintiff fabricated evidence against supervisor in sexual harassment case); McDowell v. Seaboard Farms of Athens, Inc., No. 95-609-CIV-ORL-19; 1996 WL 684140 at *10 (M.D. Fla.) (case dismissed for fraud upon the court in fabricating evidence to support claim of race discrimination).

There are a number of factors to consider in determining whether a dismissal with prejudice is the appropriate sanction for committing fraud:

(1) the degree of actual prejudice to the defendant;

(2) the amount of interference with the judicial process;

(3) the centrality of the fraud to the matters at issue in the litigation;

(4) the culpability of the litigant and whether his actions were willful, intentional or in bad faith;

(5) the due process/warning given to the offending party that dismissal of the action would be a likely sanction;

(6) the efficacy of lesser sanctions; and

(7) the public interest in the integrity of the judicial system.

In re Amtrak "Sunset Limited" Train Crash in Bayou Canot, AL on Sept. 22, 1993, 136 F. Supp. 2d 1251, 1267 (S.D. Ala.), aff'd sub nom. In re Amtrak, 29 Fed. Appx. 575 (11th Cir. 2001); see also Betty K Agencies, Ltd. v. M/V MONADA, 432 F.3d 1333, 1338 (11th Cir. 2005) ("[A] dismissal with prejudice...is an extreme sanction that may be properly imposed only when: (1) a party engages in a clear pattern of delay or willful contempt (contumacious conduct); and (2) the district court specifically finds that lesser sanctions would not suffice."). An evaluation of these factors show that it is

appropriate for the court to invoke its inherent authority to dismiss the plaintiff's lawsuit with prejudice as a sanction for committing fraud on the court.

(1) The degree of actual prejudice to the defendants.

There is significant prejudice to the defendants, who have expended substantial resources in establishing that the plaintiff's Incident Report is fraudulent. Thus, the plaintiff's fraudulent conduct has created satellite litigation in investigating the plaintiff's allegations, compiling evidence to establish the fraud, drafting memoranda on the issue, and participating in two evidentiary hearings, one of which involved arranging for numerous witnesses to testify, including retired employees. This fraud has also deviated the defendants from the defense of the case generally, and delayed progression of the case.

(2) The amount of interference with the judicial process.

The plaintiff's fraud clearly interfered with the judicial process, as it has resulted in a gross waste of judicial resources and significantly delayed the progression of this case. Thus, the court has expended a substantial amount of time considering the cross-motions for sanctions,

conducting two evidentiary hearings, reviewing exhibits, and drafting this report and recommendation. Consequently, the process of resolving this issue has taken several months. Concomitantly, the fraud delayed the progression of this case and interfered with the court's case management. The final resolution of this motion by the district judge will further tax the court's limited judicial resources.

(3) The centrality of the fraud to the matters at issue in the litigation.

The fraud is central to the plaintiff's contention that the defendants violated his civil rights by confiscating witness affidavits that could have exonerated him of the charges in the Pinellas County case (Doc. 59, p. 11). The plaintiff was found guilty in that case, and he is serving a life sentence. The plaintiff asserts in his third amended complaint the importance of those affidavits, stating that, if he had the Pinellas County witness affidavits, he would "give to circuit court and dismiss his case and go home, but defendant's failed to return evidence and plaintiff lost case's (2) two of them, Plaintiff is with in rights to sue for 6 years of const[a]nt rights violations" (id.). The fraudulent Incident Report is integral to this claim

because it purports to be an admission by an HCSO officer that an officer took those Pinellas County witness affidavits.   Therefore, as the plaintiff characterized it, "Ex. J[the Incident Report]...[i]s very damaging to there [sic] case if let in" (Doc. 77, p. 8).

The plaintiff attempts to minimize the significance of this evidence, testifying at the hearing that it was "a small event."  However, the plaintiff has repeatedly stated the importance of the purported Pinellas County witness affidavits and the Incident Report.  See, e.g., id. (the Incident Report "would be 'exculpatory to Plaintiff' and 'Inculpatory to Defendant's' case").  Therefore, the plaintiff's assertion is nothing more than a transparent attempt to avoid the consequences of his fraudulent conduct.

The plaintiff also seems to argue that the Incident Report is cumulative.  In this regard, the plaintiff argues that "Dep. Reiter testified multiple times to having knowledge of event's in document dated 'Feb 19, 2008" (Doc. 77, p. 8).  This contention is specious.

In this regard, the plaintiff refers to testimony of Deputy Reiter in the Pinellas County case. Deputy Reiter stated that, when the plaintiff presented to him the fraudulent Incident Report, "it appear's that I forwarded

some type of documents...who then forwarded it for further investigation"
(Doc. 77, p. 7). However, Deputy Reiter explained during his testimony at the
evidentiary hearing that he was shocked when the plaintiff presented the
Incident Report to him in the Pinellas County case because he had no
recollection of taking any affidavits from the plaintiff's prison cell (see also
Doc. 89-4, p. 38).[12]   In sum, the plaintiff's attempt to undermine the
significance of the fraudulent Incident Report is unpersuasive.

(4) The culpability of the litigant and whether his actions were
willful, intentional or in bad faith.

There is no question that the plaintiff's fraudulent conduct was
in bad faith because he fabricated the Incident Report and filed it in court
with the intention that it would improperly influence the outcome of this case
in his favor.   Further, the plaintiff perpetuated the fraud by testifying
untruthfully at the hearing on this matter.

---

[12]The plaintiff also refers to a report log which indicates that Deputy Reiter took
from the plaintiff's prison cell "affidavits for other I/Ms" (Doc. 98, p. 10). However, other
I/M's refers to affidavits the plaintiff was creating for other inmates. Further, an Inmate
Information log from 2009 specifies the taking of "legal mail" (id., pp. 11, 12). It does not
indicate that witness affidavits for the Pinellas County case were confiscated.

Moreover, as discussed <u>supra</u>, pp. 20-23, the plaintiff's deceit extends beyond the Incident Report. Thus, the plaintiff also submitted in this case a falsified affidavit from Julie A. Roberts, which purported to recant her accusations against him, and fabricated a portion of an Inmate Request form to make it appear that an HCSO lieutenant acknowledged the taking of his purported Pinellas County witness affidavits. Therefore, the evidence shows that the plaintiff's fabrication of the Incident Report was part of a larger scheme by the plaintiff to defraud the defendants and the court.

(5) <u>The due process/warning given to the offending party that dismissal of the action would be a likely sanction.</u>

The plaintiff was on notice that the sanction of dismissal was being considered by the court, as the defendants specifically requested that sanction. The defendants, furthermore, argued forcefully that no lesser sanction would be effectual. Moreover, the court conducted two evidentiary hearings, which underscored the seriousness of the matter. Nevertheless, the plaintiff made no attempt to withdraw the Incident Report from consideration. Rather, he perpetuated the fraud at the evidentiary hearing with untruthful testimony in an attempt to obfuscate the fraud.

(6) <u>The efficacy of lesser sanctions</u>.

The defendants argue that "the only appropriate sanction would be to dismiss this case, with prejudice" (Doc. 61, p. 5). Different types of sanctions were considered, after which it was clear that no lesser sanction other than dismissal would sufficiently punish and deter the plaintiff's abusive conduct.

As the court discussed in <u>Chemtall, Inc.</u> v. <u>Citi-Chem, Inc.</u>, 992 F. Supp. 1390, 1409-1410 (S.D. Fla. 1998) (citations omitted):

> "Ultimate sanction" cases ultimately rest upon the conviction that no lesser sanction will prevent the offending litigant from continuing to lie or distort the truth so pervasively that it prevents the opposing party from fairly presenting his case.... Use of the ultimate sanction addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole, for such misconduct threatens the very integrity of the courts....
>
> Those who lie, evade and fail to tell the...truth obviously enjoy an advantage over honest litigants. The victimized opponent winds up...consuming substantial resources to respond to and undo the victimizer's lies and distortions.... In the meantime, the Court itself is prevented from actually reaching the merits of the case—as well as resolving other cases—by having to stop and...exhaustively examine what is, at bottom, fraud upon the court.

Chemtall's rationale is equally applicable here.

First, a monetary sanction would be ineffectual because the plaintiff lacks the resources to pay it. As the Eleventh Circuit stated in Martin v. Automobili Lamborghini Exclusive, Inc., supra, 307 F.3d at 1337:

> [S]anctions must never be hollow gestures; their bite must be real. For the bite to be real, it has to be a sum that the person might actually pay. A sanction which a party clearly cannot pay does not vindicate the court's authority because it neither punishes nor deters.

Further, the sanction of striking the plaintiff's claim that the defendants confiscated his Pinellas County witness affidavits is not proportionate to the severity of the plaintiff's improper conduct. The plaintiff's fraudulent conduct is a flagrant and egregious attempt to improperly influence the outcome of this case, and permitting the plaintiff to continue the lawsuit he attempted to win by fraudulent means, even with the striking of a claim, is an insufficient punishment. See Vargas v. Peltz, supra, 901 F. Supp. at 1582 ("Permitting the lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues").

A lesser sanction would not protect sufficiently the interest of the defendants, or the integrity of the court. Thus, the plaintiff is unquestionably recalcitrant and, therefore, he would undoubtedly continue to press his argument about the Pinellas County witness affidavits, notwithstanding any court orders to the contrary. As indicated, the defendants made a compelling showing at the first phase of the evidentiary hearing that the plaintiff had submitted fraudulent materials. The plaintiff had sixteen days to contemplate, and reconsider, his position before the hearing resumed. Nevertheless, the plaintiff continued to assert his false claim. Consequently, there is no reason to think that the plaintiff would moderate his behavior and refrain from fraud and lying.

Moreover, a lesser sanction is inadequate to remedy the harm to the public interest in preserving the integrity of the courts. Thus, the plaintiff's fraudulent conduct "transcends the interests of the parties in the underlying action....It is conduct that so violates the judicial process that imposition of a harsh penalty is appropriate not only to reprimand the offender, but also to deter future parties from trampling upon the integrity of the court." Zocaras v. Castro, 465 F.3d 479, 484 (11th Cir. 2006) (citation

-33-

omitted).  Therefore, the sanction of dismissal is also appropriate to signal

other litigants that fraudulent conduct which goes to a central issue in the

matter will not be tolerated and, concomitantly, that they will not be permitted

to benefit from it.

(7) <u>The public interest in the integrity of the judicial system</u>.

As indicated, the egregiousness of the plaintiff's fraudulent

conduct warrants the severe sanction of dismissal in order to deter future

parties from engaging in such conduct, thereby promoting the integrity of the

court system.

In sum, all of these factors favor the court's invocation of its

inherent authority to impose the sanction of dismissal with prejudice for the

plaintiff's fraudulent conduct.[13]

---

[13] The defendants also cite as a ground for dismissal Rule 41(b), F.R.Civ.P., which permits dismissal for failure to comply with the Federal Rules of Civil Procedure, or a court order (Doc. 61, p. 9).  The underlying rule that the defendants allege the plaintiff violated is Rule 11(b), F.R.Civ.P.

"Rule 11 forbids lying in pleadings, motions and other papers filed with the court; and Rule 41(b) provides for dismissal with prejudice as the ultimate sanction for violation of th[at] rule[]." <u>Zocarias v. Castro</u>, <u>supra</u>, 465 F.3d at 484.  However, Rule 11 sanctions may not be imposed unless "[a] motion for sanctions...[is] made separately from any other motion....served under Rule 5, but...not be filed or...presented to the court if the challenged paper... is withdrawn...within 21 days after service..." Rule 11(c)(2).

The defendants have not complied with Rule 11(c), F.R.Civ.P.  Dismissal of this case pursuant to Rule 41(b), absent compliance with Rule 11's "safe harbor" provision, would circumvent that procedure.  Therefore, the recommendation for the sanction of dismissal is not based upon Rule 41(b), F.R.Civ.P.

IV.

Finally, the defendants also requested in the "wherefore" clause of their motion "an award...of the expenses and attorney's fees associated with and incurred in the defense of this case and the filing of this motion" (Doc. 61, p. 10).  However, that request was not properly developed; the focus of this motion was solely the dismissal of the case with prejudice. Therefore, this additional relief is appropriately denied.

V.

For the foregoing reasons, I recommend that the Defendants' Motion for Sanctions Due to Plaintiff's Fraud on the Court (Doc. 61) be granted, the plaintiff's motion counterclaim for sanctions be denied (Doc. 77), and the plaintiff's lawsuit be dismissed with prejudice.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: OCTOBER 19, 2016

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.